# UNITED STATES DISTRICT COURT
## FOR THE
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE



FEB 2 1 2023

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

Christopher-Stephen: Jones, beneficiary,

       Sovereign, Plaintiff,

    v.

                                              Case No.: 3:23-CV-9-KAC-DCP

STATE OF TENNESSEE, TENNESSEE
DEPARTMENT OF CORRECTION (TDOC),
TENNESSEE REHABILITATIVE INITIATIVE
IN CORRECTIONS (TRICOR), Tony Parker,
Lisa Helton, Shawn Phillips, Brett Cobble,
Melissa Campbell, Allan Lewis, Brian Cox, Tim
Mooneyham, Jessica Brown and Zack Koczwara.

              Defendants.

## INTRODUCTION

1.    This is a civil rights complaint filed by Christopher-Stephen: Jones, beneficiary, a state prisoner, alleging, among other claims, violations of constitutional and federal rights of Plaintiff, Defendants STATE OF TENNESSEE, TENNESSEE DEPARTMENT OF CORRECTION, TENNESSEE REHABILITATIVE INITIATIVE IN CORRECTIONS, Tony Parker, Lisa Helton, Shawn Phillips, Brett Cobble, Allan Lewis, Tim Mooneyham, Jessica Brown and Zack Koczwara. This complaint seeks remedies pursuant to Title 15, UNITED STATES CODE, Section 2087(b)(4)(A)-(C), Title 26, UNITED STATES CODE, Sections and 7623(d)(3)(A)-(B) and Title 42, UNITED STATES CODE, Sections 1983, 1985, and 1986.

## JURISDICTION

2.    Jurisdiction over Plaintiff's civil rights claims is conferred upon the UNITED STATES DISTRICT COURT by Title 15, UNITED STATES CODE, Section 2087(b)(4), Title 26, UNITED STATES CODE, Section 7623(d)(2)(A)(ii), Title 28, UNITED STATES CODE, Sections 1331, 1340, 1343(a)(3)-(4), 1355(a), and 1357, and Title 29, UNITED STATES CODE, Sections 217 and 218c(b). Jurisdiction over Plaintiff's state law claims against Defendants is conferred upon the UNITED STATES DISTRICT COURT by Title 28, UNITED STATES CODE, Section 1367(a).

## VENUE

3.    The actions giving rise to Defendant's liability, as alleged in this complaint, occurred in the County of BLEDSOE, TENNESSEE. Venue is therefore proper in the UNITED STATES DISTRICT

COURT for the EASTERN DISTRICT of TENNESSEE pursuant to Title 28, UNITED STATES CODE, Section 1391(b)(2).

## IDENTIFICATION OF PARTIES

4.      Plaintiff, Christopher-Stephen: Jones, beneficiary, Sovereign, pro per, Appearing Specially, not Generally or Voluntarily, in writing as beneficiary of the Cestui que Trust "CHRISTOPHER STEPHEN JONES," Trust No. 413295662 and Prison Trust "JONES CHRISTOPHER," Trust No. 00548278, was housed at what is now called BLEDSOE COUNTY CORRECTIONAL COMPLEX (BCCX) (originally opened in 1979 under the name Bledsoe County Regional Correctional Facility and later re-named Southeast Regional Correctional Facility, with a long history of unconstitutional practices dating back to *Grubbs v. Bradley*, 552 F. Supp. 1052 (D.C. Tenn. 1982)), 1045 Horsehead Road, PIKEVILLE, TENNESSEE, 37367, during the time at which the claims within this complaint originated. Plaintiff is currently housed at HARDEMAN COUNTY CORRECTIONAL FACILITY (HCCF), located at 2520 Union Springs Road, WHITEVILLE, TENNESSEE, 38075.

5.      At all times material to this complaint, Defendant STATE OF TENNESSEE (the STATE) was, and still is, a for profit corporation, registered and recorded at Dun & Bradstreet, organized and existing under the Constitution, statutes and laws of the United States, whose Supreme Executive Corporate Power lies in the TENNESSEE GOVERNOR (GOVERNOR) pursuant to Article 3, Section 1 of the TENNESSEE Constitution, and is responsible for establishing, overseeing and supervising the corporations TDOC and TRICOR, including the appointment of TDOC's Chief Executive Corporate Officer (CEO), Defendant Tony Parker (Tony Parker). During the commission of the acts alleged in this complaint, the STATE was acting under color of law pursuant to Article 3, Section 10 of the Constitution of the STATE of TENNESSEE, and as a corporation existing under the Constitution, statutes and laws of the United States. The STATE is sued in its official capacity.

6.      At all times material to this complaint, Defendant TENNESSEE DEPARTMENT OF CORRECTION (TDOC) was, and still is, a for profit corporation, registered and recorded at Dun & Bradstreet, organized and existing under the Constitution of the United States, the Constitution of the STATE of TENNESSEE and the statutes and laws of the United States and STATE of TENNESSEE, and has the responsibility for establishing, operating, running and overseeing state penitentiaries and privately managed facilities, and their employees, including BCCX and HCCF as-well-as duties under to T.C.A. § 4-3-606 and under T.C.A. § 4-6-102, has the power necessary for the full and efficient exercise of authority necessary for the executive and administrative supervision of all such institutions. During the commission of the acts alleged in this complaint, TDOC and its employees were acting and operating under color of law pursuant to T.C.A. § 41-1-103, and as a legislatively enacted corporation pursuant to T.C.A. § 4-3-601. TDOC is sued in its official and public capacities.

7.      At all times material to this complaint, Defendant TENNESSEE REHABILITATIVE INITIATIVE IN CORRECTION (TRICOR) was, and still is, a for profit corporation, registered and recorded at Dun & Bradstreet, organized and existing under the Constitution of the United States, the Constitution of the STATE of TENNESSEE and the statutes and laws of the United States and STATE of TENNESSEE, and has the authority to establish, provide and oversee employment and programming opportunities for inmates housed within the TDOC, amongst others, with duties codified in T.C.A. § 41-22-403 and with corporate BOARD members appointed by the GOVERNOR pursuant to T.C.A. § 41-22-405(a)(1) who are accountable to the GOVERNOR and the general assembly and have a responsibility to supervise their state employees. During the commission of the acts alleged in this complaint, TRICOR and its state employees were acting and operating under color of law pursuant to T.C.A. §§ 41-1-103 and 41-22-401 et seq., and 18 U.S.C. § 1761, and as a legislatively enacted corporation pursuant to T.C.A. § 41-22-404. TRICOR is sued in its official and public capacities.

8.      Tony Parker was the Commissioner and CEO of TDOC pursuant to T.C.A. § 4-3-603, was

appointed by the GOVERNOR pursuant to T.C.A. § 4-3-602(b), and charged then with duties contained in T.C.A. §§ 4-3-601 et seq. and 41-1-103. Pursuant to T.C.A. § 41-1-102(a), Tony Parker was also charged with the duty of hiring, with the approval of the GOVERNOR, a competent professional staff of employees to operate and oversee the correctional system in accordance with principals and standards accepted in the professional field of corrections and supervise the staff under his control and ensure they conducted the performance of their duties in accordance with the statutes and laws which comprise the governance of his office. Pursuant to his appointment under T.C.A. § 4-3-602(b), which is at the pleasure of the GOVERNOR, Tony Parker was subject to the orders and control of the GOVERNOR in-so-far-as they conformed to his oath of office pursuant to T.C.A. § 41-1-103 and comported to superseding constitutional, federal and state statutes and laws. During the commission of the relevant acts alleged in this complaint, Defendant Tony Parker was acting under color of law pursuant to T.C.A. §§ 4-3-601 et seq., 41-1-102(a) and 41-1-103 as Commissioner and CEO of TDOC. Tony Parker is sued in his individual and official capacities and as a natural person[1].

9.  Lisa Helton is the Commissioner and CEO of TDOC pursuant to T.C.A. § 4-3-603, appointed by the GOVERNOR pursuant to T.C.A. § 4-3-602(b), and charged with duties contained in T.C.A. §§ 4-3-601 et seq. and 41-1-103. Pursuant to T.C.A. § 41-1-102(a), Lisa Helton is also charged with the duty of hiring, with the approval of the GOVERNOR, a competent professional staff of employees to operate and oversee the correctional system in accordance with principals and standards accepted in the professional field of corrections and supervising the staff under her control and ensuring they conduct the performance of their duties in accordance with the statutes and laws which comprise the governance of her office. Pursuant to her appointment under T.C.A. § 4-3-602(b), which is at the pleasure of the GOVERNOR, Lisa Helton is subject to the orders and control of the GOVERNOR in-so-far-as they conform to her oath of office pursuant to T.C.A. § 41-1-103 and comport to superseding constitutional, federal and state statutes and laws. During the commission of the relevant acts alleged in this complaint, Defendant Lisa Helton was acting under color of law pursuant to T.C.A. §§ 4-3-601 et seq., 41-1-102(a) and 41-1-103 as Commissioner and CEO of TDOC. Lisa Helton is sued in her individual and official capacities and as a natural person and the real party in interest.

10.  At all times material to this complaint, Defendant Shawn Phillips was an employee of the TDOC corporation, assigned as the WARDEN for BCCX, appointed with the approval of the TDOC CEO and GOVERNOR pursuant to T.C.A. § 41-1-102(a), charged with the duties codified in T.C.A. §§ 4-6-101 et seq., 41-1-103 and 41-1-104, and responsible for supervising the staff under his control and ensuring they conduct the performance of their duties in accordance with all federal and state statutes, laws and legal policies. Pursuant to T.C.A. § 41-1-102(c), WARDEN Shawn Phillips (WARDEN Phillips) is subject to the orders and control of the TDOC CEO and the rules and regulations as may be adopted by the TDOC CEO in-so-far-as they conform to his oath of office pursuant to T.C.A. § 41-1-103 and comport with superseding constitutional, federal and state statutes and laws. During the commission of the acts alleged in this complaint, WARDEN Phillips was acting under color of law pursuant to T.C.A. §§ 4-6-101 et seq. and 41-1-103 as a TDOC employee. Shawn Phillips is sued in his individual and official capacities and as a natural person and the real party in interest.

11.  At all times material to this complaint, Defendant Brett Cobble was an employee of the TDOC corporation, assigned as the ASSOCIATE WARDEN OF TREATMENT (AWT) for BCCX, appointed with the approval of the TDOC CEO, GOVERNOR and WARDEN Phillips pursuant to T.C.A. §§ 4-6-103 and 41-1-102(a), charged with duties codified in T.C.A. § 41-1-103 and elsewhere in constitutional, federal and state statutes and laws relating to the treatment of inmates. Pursuant to T.C.A. §§ 4-6-103 and 41-1-102(a), AWT Brett Cobble (AWT Cobble) is subject to the orders and control of WARDEN Phillips and the TDOC CEO and the rules and regulations they may adopt in-so-far-as they conform to his oath of office pursuant to T.C.A. § 41-1-103 and comport with superseding constitutional, federal and state statutes and laws. During the commission of the acts alleged in this

---

1  Unless Defendants refute they are natural persons born under God, then they are such.

complaint, AWT Cobble was acting under color of law pursuant to T.C.A. § 41-1-103 as a TDOC employee. Brett Cobble is sued in his individual and official capacities and as a natural person and the real party in interest.

12. At all times material to this complaint, Defendant Allan Lewis was, a state employee of the TRICOR corporation, assigned as the MANAGER of the production plant located outside the inner perimeter at BCCX Site-2, charged with duties codified in T.C.A. § 41-1-103 and TRICOR Standard Operating Procedure (SOP) and subject to the orders and control of the TRICOR CEO. During the commission of the acts alleged in this complaint, Allan Lewis was acting under color of law pursuant to T.C.A. § 41-1-103 as a TRICOR state employee. Allan Lewis is sued in his individual and official capacities and as a natural person and the real party in interest.

13. At all times material to this complaint, Defendant Brian Cox was an employee of the TDOC corporation, assigned as an INMATE JOB COORDINATOR for BCCX, appointed with the approval of the TDOC CEO, GOVERNOR and WARDEN Phillips pursuant to T.C.A. §§ 4-6-103 and 41-1-102(a), charged with duties codified in T.C.A. § 41-1-103 and of ensuring the proper, constitutional and legal administration of all TDOC Policies and specifically #505.01 et seq.. Pursuant to T.C.A. 4-6-103 and 41-1-102(a), Brian Cox is subject to the orders and control of WARDEN Phillips, and the TDOC CEO and the rules and regulations they may adopt in-so-far-as they conform to his oath of office pursuant to T.C.A. § 41-1-103 and comport with superseding constitutional, federal and state statutes and laws. During the commission of the acts alleged in this complaint, Brian Cox was acting under color of law pursuant to T.C.A. § 41-1-103 as a TDOC employee. Brian Cox is sued in his individual and official capacities and as a natural person and the real party in interest.

14. At all times material to this complaint, Defendant Tim Mooneyham was an employee of the TDOC corporation, assigned as a COUNSELOR (Level-3) for Team-2 at BCCX Site-2, appointed with the approval of the TDOC CEO, GOVERNOR and WARDEN Phillips pursuant to T.C.A. §§ 4-6-103 and 41-1-102(a), charged with duties codified in T.C.A. § 41-1-103 and of ensuring the proper, constitutional and legal administration of all TDOC Policies and specifically #401.01 et seq., #501.02, #502.06, #508.01 et seq., #511.01 et seq.; and #513.01 et seq.. Pursuant to T.C.A. §§ 4-6-103 and 41-1-102(a), Tim Mooneyham is subject to the orders and control of WARDEN Phillips, AWT Cobble and the TDOC CEO and the rules and regulations they may adopt in-so-far-as they conform to his oath of office pursuant to T.C.A. § 41-1-103 and comport with superseding constitutional, federal and state statutes and laws. During the commission of the acts alleged in this complaint, Tim Mooneyham was acting under color of law pursuant to T.C.A. § 41-1-103 as a TDOC employee. Tim Mooneyham is sued in his individual and·official capacities and as a natural person and the real party in interest.

15. At all times material to this complaint, Defendant Jessica Brown was an employee of the TDOC corporation, assigned as a COUNSELOR (Level-3) for Team-2 at BCCX Site-2, appointed with the approval of the TDOC CEO, GOVERNOR and WARDEN Phillips pursuant to T.C.A. §§ 4-6-103 and 41-1-102(a), charged with duties codified in T.C.A. § 41-1-103 and of ensuring the proper, constitutional and legal administration of all TDOC Policies and specifically #401.01 et seq., #502.02, #502.06, #508.01 et seq., #511.01 et seq., and #513.01 et seq.. Pursuant to T.C.A. §§ 4-6-103 and 41-1-102(a), Jessica Brown is subject to the orders and control of WARDEN Phillips, AWT Cobble and the TDOC CEO and the rules and regulations they may adopt in-so-far-as they conform to her oath of office pursuant to T.C.A. § 41-1-103 and comport with superseding constitutional, federal and state statutes and laws. During the commission of the acts alleged in this complaint, Jessica Brown was acting under color of law pursuant to T.C.A. § 41-1-103 as a TDOC employee. Jessica Brown is sued in her individual and official capacities and as a natural person and the real party in interest.

16. At all times material to this complaint, Defendant Zack Koczwara was an employee of the TDOC corporation, assigned as a SERGEANT for Team-2 at BCCX, appointed with the approval of the TDOC CEO, GOVERNOR and WARDEN Phillips pursuant to T.C.A. §§ 4-6-103 and 41-1-102(a), charged with duties codified in T.C.A. § 41-1-103. Pursuant to T.C.A. §§ 4-6-103 and 41-1-102(a),

SERGEANT Zack Koczwara (Sgt. Koczwara) is subject to the orders and control of WARDEN Phillips AWT Cobble and the TDOC CEO and the rules and regulations they may adopt in-so-far-as they conform to his oath of office pursuant to T.C.A. § 41-1-103 and comport with superseding constitutional, federal and state statutes and laws. During the commission of the acts alleged in this complaint, Sgt. Koczwara was acting under color of law pursuant to T.C.A. § 41-1-103 as a TDOC employee. Zack Koczwara is sued in his individual and official capacities and as a natural person and the real party in interest.

## ADMINISTRATIVE REMEDIES

17. Plaintiff has availed himself of, and exhausted, all administrative remedies, and/or should be excused from grieving latter issues due to denial of a meaningful opportunity to timely grieve and other issues (see #160, #181 and the last sentence of #192, below), and further such grievance would be to complain about ongoing and continuing retaliatory conditions which Defendants were previously made well aware of.

18. Additionally, Plaintiff complied with the notification requirement of 15 U.S.C. § 2087(b)(1) within 180 days of his retaliatory firing and the UNITED STATES SECRETARY OF LABOR (SECRETARY OF LABOR) also failed to investigate this complaint. Since the SECRETARY OF LABOR failed to issue a final decision within 210 days regarding Plaintiff's retaliatory firing complaint, as required by 15 U.S.C. §2087(b)(4), in addition to Defendant's violation of 29 U.S.C. § 218c(a), Plaintiff is entitled to bring this matter to this Court to be tried by the court with a jury.

19. Also, Plaintiff complied with the notification requirement of 26 U.S.C. § 7623(d)(2)(A)(i) and (B)(iv) within 180 days of the then most recent occurrence of Defendants violations to Title 26 U.S.C. et seq. and the SECRETARY OF LABOR also failed to investigate this complaint. Since the SECRETARY OF LABOR failed to issue a final decision within 180 days regarding Plaintiff's tax code violations complaint, Plaintiff is entitled to bring the tax fraud and evasion claims contained herein before this Court pursuant to 26 U.S.C. § 7623(d)(2)(A)(ii) and is entitled pursuant to 26 U.S.C. § 7623(d)(2)(B)(v) to a trial by jury on these claims.

## FACTS

20. Plaintiff freely and voluntarily entered, pursuant to T.C.A. § 41-6-203(c), into a contract in the Private Sector, pursuant to T.C.A. § 41-22-116(e), with, and thus became employed as A wood-scraper by, the TRICOR corporation of the STATE, in a federally authorized, pursuant to 18 U.S.C. § 1761, and federally funded PIECP, for a wage established by the TRICOR BOARD which "shall be no less than the mean wage for the applicable occupation under the 'construction and extraction occupations' published in the TENNESSEE Occupational Wages Report, as defined in T.C.A. § 12-4-907[,]" pursuant to T.C.A. § 41-6-204. Plaintiff's TRICOR employment requires the performance of services on commercial goods to be sold by Shaw Flooring Group Inc. to a private company in SOUTH CAROLINA STATE through interstate commerce.

21. Additionally, Plaintiff is not made, and cannot be compelled, to enter into contracted employment in a PIECP with TRICOR.

22. The terms of Plaintiff's TRICOR PIECP deductions, which comport with the requirements of 18 U.S.C. § 1761, are outlined in his Private Sector Employment Contracts. This contract establishes between Plaintiff and TRICOR, a relationship of "Master and Servant."

23. Plaintiff has a protected interest in his TRICOR employment and wages.

24. Pursuant to 4-3-603(a), Tony Parker and Lisa Helton, who have the immediate charge of the management and government of the institutions of the department, and are charged with devoting their entire time and attention to the duties of their position, then delegated their authority, as it relates to the resolution of Level-III grievances, to Lee Dotson in TDOC Policy #501.01, thus making him their

designee in such matters. They had a duty to supervise their designee in the performance of their delegated responsibility and ensure their responsibility was being properly administered. Both Tony Parker and Lisa Helton failed to properly supervise their grievance Level-III designee, Lee Dotson, and ensure that their designee was conforming to his oath of office pursuant to T.C.A. § 41-1-103 and that his investigation of grievances and resulting decisions comported with the constitutional, federal and state statutes and laws of the land.

25.     On December 20, 2021, Plaintiff filed with the UNITED STATES DISTRICT COURT, EASTERN DISTRICT of TENNESSEE and served upon Defendants the STATE and TDOC an Amended Complaint in case no.: 3:21-CV-123-KAC-DCP (the lawsuit that triggered the retaliation herein), containing enough specificity to make clear the substance of the unconstitutional "takings" being conducted by their for profit corporations and employees.

## 1st Act of Retaliation

26.     On December 21, 2021, Plaintiff was fired by Allan Lewis, either acting alone or in conjunction with TDOC and/or TRICOR or their agents, employees or subordinates, from his TRICOR job in retaliation for, and in a misguided attempt to, manipulate and moot Plaintiff's standing in the claims implicating wrongdoing by the STATE, TDOC, TRICOR and Allan Lewis, contained within the Amended Complaint and because of his personal relationship with Melissa Campbell whom Plaintiff sued as a Defendant in the lawsuit that triggered the retaliation herein. As of the date Plaintiff was still employed in TRICOR's PIECP, he was still suffering from the unconstitutional takings Defendants were conducting in the lawsuit that triggered the retaliation herein.

27.     On December 22, 2021, Plaintiff filed a grievance complaining of the retaliatory firing, that he refused to sign a "Job Drop" form when presented with one at TRICOR, that he told everyone involved with TRICOR and Re-Entry that he consented to being removed from the Registry for the CLGOC position, that the previous clerk held that position for **(8) years** and Plaintiff had been on the registry for that position for **(6) years**, and the fact that he had never been interviewed (thus there is no proof of requisite qualification) for the position he was forcibly placed into. The re-entry clerk's position, TDOC Job Code "CLGOC," requires candidates to be interviewed and tested prior to assignment.

28.     On December 27, 2021, Plaintiff's grievance was finally initially processed by SERGEANT Ray Worthington (Sgt. Worthington) in the grievance department. Sgt. Worthington then forwarded the grievance to Brett Cobble on his own initiative (even though Cobble's name didn't appear in the grievance nor does Brett Cobble have any direct affiliation with the job assignment process in these circumstances).

29.     As a result of Plaintiff's retaliatory firing, Plaintiff has lost gainful high-paying employment wages, including interest thereupon, needed for the prosecution of his lawsuit (monies which the Clerk of Court has suddenly started asking for to produce documents Plaintiff requires to be informed and move forward in the prosecution of this case towards the most meaningful and favorable outcome), federally funded programming opportunities, TRICOR seniority, membership in a peaceably assembled organization (The Lifer's Club) which he had been a member of for more than 5 years and various institutional and employment incentives.

30.     Plaintiff lodged a complaint with the SECRETARY OF LABOR complaining of all the retaliatory matters contained herein relating to his duty to investigate and respond. As of (180) days of the filing of this complaint, the SECRETARY OF LABOR has failed to investigate the complaints lodged by Plaintiff or issue a final Order pursuant thereto.

31.     With respect to this "1st Act of Retaliation," Plaintiff was the only inmate employed in a PIECP with TRICOR at Bledsoe, who was complaining about the conditions of confinement in federal court regarding Defendants' unconstitutional taking of property contained in the lawsuit that triggered the retaliation herein, who has been subjected to a retaliatory firing (thus far), and therefore, with respect

to Claim ???, Plaintiff additionally qualifies as a "Class of One."

2nd Act of Retaliation

32.     Around 6:30 am on December 28, 2021, the day after Sgt. Ray Worthington finally processed Plaintiff's December 22, 2021 grievance, Sgt. Worthington called Plaintiff to his office in the Site-2 library to inform Plaintiff that his grievance had been responded to by AWT Cobble, who claimed to be Plaintiff's supervisor, instead of TRICOR employee Allan Lewis, who actually was Plaintiff's supervisor. AWT Cobble stated that the previous clerk, J.T., (who had actually been in the same job for **(8) years** as the re-entry clerk for COUNSELOR Susan Garrett), had supposedly been in his position for (16) months now, that he could no longer hold that position, and since Plaintiff's name was "next" on the register for the re-entry clerks position, (a register which he had been on for over **(6) years**), that he needed to fill J.T.'s position as the re-entry clerk (the day after Plaintiff filed his Amended Complaint), a position which Plaintiff had not been interviewed for as required by TDOC Policy.

Sgt. Worthington asked Plaintiff if he agreed with AWT Cobble's response. Plaintiff pointed out the irregularities in the time line surrounding the job registries and the failure to address the other issues raised in the grievance, and replied that he did not agree with the response. Plaintiff stated he wanted to appeal AWT Cobble's response, signed the grievance indicating such, and Sgt. Worthington said he would schedule a hearing that morning for the GRIEVANCE BOARD.

33.     At the grievance hearing, around 7:30 am on December 28, 2021, Plaintiff presented to the GRIEVANCE BOARD, where Jessica Brown and Zack Koczwara appeared as BOARD members, all the objections mentioned above, and entered a typed "Grievance Hearing Response" stating tacit admissions and other facts: no parties within the complaint objected to the factual matters raised; there was no objection to the fact that Plaintiff's retaliatory job drop was stated as being required to place him in the [clerk's] position; his current job supervisor, Susan Garrett, was never given an opportunity to interview him for the position as required by policy; he had been on the CLGOC registry for over (6) years as shown in the Job/Class Registry print-out; the inmate who was forcibly removed from the re-entry clerk position was in that position for a total of almost (8) years; around 2-3 years prior, the inmate who was in the clerk's position was removed from that position for disciplinary reasons and the position remained vacant during his absence and he was permitted to volunteer in that position until he was permitted by policy to be reassigned as the clerk; and the evidence shows that there was no actual need to vacate the previous clerk from his position or forcibly remove Plaintiff from TRICOR. Plaintiff also submitted a copy of a CR-3169 "Request for Removal from Job Register," submitted on December 21, 2021, witnessed by CORRECTIONS OFFICER Todd Smith, the Job/Class Register print-out from the TOMIS system showing his placement on the CLGOC register since September 10, 2015, and a couple of pages of hand-written portions of TDOC Policy #505.07 showing the many reasons why this job change was improper, unnecessary, and historically unprecedented in the way it singles out and treats differently both Plaintiff and the clerk who was removed. The BOARD agreed with the conclusion of AWT Cobble.

34.     After the hearing concluded on December 28, 2021, ((1) week after Plaintiff was fired from TRICOR), upon learning from Sgt. Ray Worthington that Plaintiff was contesting the initial grievance response from AWT Cobble and that a hearing had been scheduled to put the retaliatory firing before the GRIEVANCE BOARD, Plaintiff's former TRICOR supervisor, Allan Lewis, placed a negative and false Contact Note in Plaintiff's TENNESSEE Offender Management Information System (TOMIS) profile in response to Plaintiff contesting AWT Cobble's inaccurate grievance response above. This Contact Note falsely stated that Plaintiff "quit" TRICOR and then proceeded to make "job threating [sic] statements" pertaining to one of the supervisors (though Plaintiff has no idea what supervisor Mr. Lewis was referring to), instead of the fact that Plaintiff was "fired," which was the truth surrounding his termination. That way, even if the GRIEVANCE BOARD sided with Plaintiff, his return to TRICOR would still be obstructed. (After the placement of this contact note, Plaintiff had only verbal

confirmation of its existence, which is why he did not grieve the matter at that time.) It was May 12, 2022, when Plaintiff received a print-out confirming the Contact Note's existence, placed into his hand by COUNSELOR Tim Mooneyham. Though by May 12, 2022, Plaintiff had been denied meaningful opportunity to timely grieve the false Contact Note and the fear from the threat of retaliatory transfer and the many acts of improper processing of, and responses to, Plaintiff grieving and appealing the retaliatory transfer, had intimidated Plaintiff to resign in the fact that the TDOC grievance process is functionally unavailable.

After being factually informed of the false Contact Note's existence in TOMIS, Defendants failed to correct the error and thus are maintaining false records willfully, and are using said records to negatively effect determinations regarding Plaintiff employment eligibility.

35.     On December 30, 2021, Jonathan Higdon presenting himself as Acting WARDEN, returned the Level-II appeal to the Sgt. Worthington, siding with the conclusions of AWT Cobble and the GRIEVANCE BOARD.

36.     On January 2, 2022, (unaware of the negative Contact Note mentioned above and wanting his job back) Plaintiff submitted a "Request for Placement on Job Register" to re-apply with TRICOR, witnessed by his then supervisor, Re-entry COUNSELOR Susan Williams Garrett (Susan Garrett).

37.     On January 6, 2022, Sgt. Worthington called Plaintiff to his office to present Acting WARDEN Higdon's response and inquire about Plaintiff's desired course of action.  Plaintiff stated he wished to initiate the Level-III response to ASSISTANT COMMISSIONER Lee Dotson (AC Dotson). Plaintiff noticed that the transmission paperwork to AC Dotson was back-dated to January 4, 2022.

38.     On January 12, 2022, the day AC Dotson returned Plaintiff's December 22, 2021 grievance back to Sgt. Worthington, Plaintiff received the "Job Placement Request back, denied by Allan Lewis, citing the false Contact Note as the reason for denial.

39.     On January 13, 2022, Plaintiff received his completed grievance process in the daily institutional mail showing AC Dotson upheld the determinations of all the previous levels of review.

40.     On March 22, 2022, while Plaintiff was working, his then boss, Susan Garrett, received an email, currently stored on the servers residing within the Strategic Technology Solutions Division of the DEPARTMENT OF FINANCE AND ADMINISTRATION (STS), which was intended for Plaintiff's viewing. While Plaintiff was never clear as to who originated the email chain, he did know that it started in a State's agency and bounced around TDOC Nashville, then made its way to BCCX and was eventually forwarded to Susan Garrett for Plaintiff to respond to.  The subject matter of the email had to do with a quarry Plaintiff submitted.  It was in fact referring to a letter Plaintiff sent to the TENNESSEE DEPARTMENT OF LABOR AND WORKFORCE DEVELOPMENT asking for a copy of the TENNESSEE Occupational Wages Report. The report is a breakdown of all the jobs within the STATE and the "mean wage" of each job type.  Plaintiff made that quarry of their office seeking to learn the "local mean wage" for the work performed at TRICOR BCCX pursuant to 18 U.S.C. § 1761(c)(2), T.C.A. § 41-6-204 and also referred to as the "Prevailing Wage" in TRICOR SOP #1008-2 § 3.

Plaintiff, not wanting to expound on the reason for making the quarry (having seen the lengthy list of people in the email chain and surmising the multitude of conversations the email had likely sparked), and fearing further retaliation by state employees, denied having knowledge of the email's intent and replied with a scanned attachment stating as much.

### 3rd Act of Retaliation

41.     On April 20, 2022, Plaintiff received from the BCCX Site-2 mail room, a Scheduling Order issued by U.S.D.C. Judge Kathryn A. Krytzer for the EASTERN DISTRICT OF TENNESSEE on April 14, 2022, setting the date Plaintiff's case that triggered this retaliation would proceed to jury trial.  That mailing was opened, inspected and logged in the institutional log-book by TDOC staff before it was given to Plaintiff.

42.     On May 5, 2022, ((3) weeks after knowledge of the jury trial date arrived to BCCX and was

noticed by TDOC staff), at around 9:50 am, Tim Mooneyham entered Plaintiff's place of work (the BCCX Site-2 Re-entry office) to inform Plaintiff that he (Tim Mooneyham) had received an email from AWT Cobble directing him to draw-up re-classification paperwork on Plaintiff for his institutional transfer to HCCF. Tim Mooneyham told Plaintiff that the reason provided by AWT Cobble for this transfer was that "HCCF had some 'problem children' that they wanted to exchange for some of ours (BCCX)." Tim Mooneyham then presented Plaintiff with a "Notice of Classification Hearing," drew a line after the writing ended on the second page, and told Plaintiff that "signing on that line only indicates receipt of the notice." Tim Mooneyham told Plaintiff he would try to get him in the hearing on Tuesday, May 10, 2022. Tim Mooneyham was labeling Plaintiff (who has no appreciable disciplinary history) "a problem child."

43.    On May 6, 2022, Plaintiff filed a grievance on AWT Cobble's initiating this latest retaliatory action and the danger this act placed Plaintiff in, citing several TDOC policies and laws which prohibit TDOC staff retaliation against inmates asserting their protected First Amendment rights of Access to the Courts and Redress of Grievances and how such acts of retaliation additionally violate other laws pertaining to their color of law. Plaintiff included such language in the grievance in an effort to motivate AWT Cobble to comply with the Constitutions of the United States and the STATE OF TENNESSEE, federal and state statutes and laws, TDOC Policies and AWT Cobble's Oath of Office.

   This grievance was accepted and logged by Sgt. A. Mace, however Sgt. Worthington later informed Plaintiff that his retaliation issues were non-grievable due to the subject matter of the retaliation, as opposed to the retaliation itself.

   Plaintiff escalated the grievance to Level-II and WARDEN Phillips upheld the determination of the non-grievability regarding the retaliation with no mention of any investigation into the retaliatory act or claims of imminent danger to Plaintiff.

   Plaintiff then escalated the grievance to Level-III and AC Dotson upheld the determinations of all the previous levels of review, also with no mention of investigation into the retaliatory act or the danger it posed to Plaintiff.

   Neither WARDEN Phillips or AC Dotson chose to investigate or address the retaliation this grievance complained of or the claims of imminent danger to Plaintiff.

44.    Later on May 6, 2022, Plaintiff saw Tim Mooneyham in his office, which was located in the front of Plaintiff's housing unit. Tim Mooneyham showed Plaintiff the email received from AWT Cobble which he had previously made reference to on May 5, 2022. The email contained 4 names that Tim Mooneyham said were selected by AWT Cobble for "special re-class" (someone re-classified outside of their regular annual re-class date) to HCCF. Plaintiff recognized 2 of the other names in the email. Calvin Tankesly, Inmate No. 00090944, who currently has 2 ongoing federal civil rights complaints (against TDOC and their contracted entities) in the U.S.D.C. MIDDLE DISTRICT of TENNESSEE, and J. Hollingsworth, who was also known to Plaintiff by his last name for filing complaints about TDOC relating to conditions of his confinement. This email's time-stamp was "5/4/2022 at 1:51 pm," and currently resides on the STS servers. Seeing these names in the email, Plaintiff was able to deduce, based on the available evidence, that the phrase "problem children," which Tim Mooneyham coined on May 5, 2022 was in fact a reference to inmates who complain about and expose crimes and unconstitutional conditions within TDOC relating to their incarceration, and that inmates who make such complaints will get labeled and transferred for doing so.

45.    On May 9, 2022, Plaintiff sent out 15 letters to a variety of local, state and federal entities within TENNESSEE informing them, including this Court and the attorney in the case that triggered this retaliation, of this latest retaliation and how it placed him at high risk of being harmed and/or killed. In the letters, Plaintiff explained that he is a nationally televised and syndicated high profile inmate (who has subsequently been imbued with notoriety within the prison system).

46.    Gangs are called Security Threat Groups by TDOC, pursuant to TDOC Policy #506.25, and their documented purpose in coalescing is to organize the subversion of the prison's authority and ability

to provide a safe and secure environment. As their TDOC designation foretells, gangs are in fact threats, and the documented acts they are responsible for cause deaths in the hundreds each year in TENNESSEE. Most of these deaths happen at CORECIVIC facilities according to the TENNESSEE COMPTROLLER OF THE TREASURY's Performance Audit Report published in January of 2020 and TENNESSEE news outlets.

47.     Plaintiff has always had protection issues in gang environments which is why he was placed on administrative segregation from the day of his arrest in his county of conviction and kept there for 25 months until he entered TDOC custody. Even in that restrictive environment, Plaintiff was assaulted twice and threatened regularly by gang members merely for being accused of a crime at that time. These protection issues had never come up within TDOC because of Plaintiff's short duration in the then secure nature of BCCX Site-1 (where Plaintiff was initially classified) and afterwards was then sent to BCCX Site-2 where there is no cohesive gang activity.

48.     Plaintiff received responses to the letters sent May 9, 2022, from their recipients. Plaintiff also has verbal confirmation from speaking with the office of James Michael Taylor, the RHEA COUNTY DISTRICT ATTORNEY GENERAL (who has prosecutorial jurisdiction over Bledsoe County) on several occasions.

49.     Plaintiff also wrote letters to the 8 prisons within the TENNESSEE penal system where there is documented moderate, or greater, gang activity, explaining the implications of him transferring to their facilities outlined above. Those institutions are: HCCF; MORGAN COUNTY CORRECTIONAL COMPLEX; NORTHEAST CORRECTIONAL COMPLEX; NORTHWEST CORRECTIONAL COMPLEX; SOUTH CENTRAL CORRECTIONAL FACILITY; TROUSDALE TURNER CORRECTIONAL CENTER; WEST TENNESSEE STATE PENITENTIARY; and WHITEVILLE CORRECTIONAL FACILITY.

50.     Plaintiff later received responses to the letters sent to the prisons on May 9, 2022.

51.     On May 10, 2022, Plaintiff was informed by the correction officer in his housing unit that he would in fact be attending a re-classification hearing that morning. Plaintiff went to Tim Mooneyham to ask about the existence of the Contact Note mentioned above. Tim Mooneyham confirmed its existence and printed a copy of the false Contact Note for Plaintiff, which is permitted by TDOC Policy, the FEDERAL PRIVACY ACT and FREEDOM OF INFORMATION ACT, as-well-as the TENNESSEE SUNSHINE ACT, and gave the copy to Plaintiff.

52.     Later on May 10, 2022, Plaintiff was called to the re-classification hearing. Outside the office where the hearing was being held, Plaintiff saw and spoke with Calvin Tankesly and told him the details regarding AWT Cobble's email to Tim Mooneyham requesting the inmate transfers. The hearing panel that day consisted of Tim Mooneyham, Jessica Brown and Zack Koczwara. Plaintiff gave each of the 3 panel members a 2-page statement he'd typed and dated the day before, informing them of the retaliatory nature of this re-classification, his safety issues, the danger this transfer placed him in, that he had not been involved in the development of this plan (which provides for no criminogenic need of his) as outlined in TDOC policy, and of their right, pursuant to TDOC Policy #401.08(VI)(E) to decent from this transfer recommendation. Plaintiff also gave them each a copy of *Farmer v Brennan*, 511 U.S. 825, 843-44, 114 S.Ct. 1970, 1982-83, 128 L.Ed.2d 811 (1994), in which the relevant portions associated with him "belonging to an identifiable group of prisoners...frequently singled out for violent attack by other inmates," that he didn't "have to await the consumption of threatened injury to obtain preventative relief" and that "a subjective approach to deliberate indifference does not require a prisoner seeking 'a remedy for unsafe conditions [to] await a tragic event [such as an] actua[l] assaul[t] before obtaining relief,'" were highlighted, and asked for their help in stopping the transfer.

Plaintiff then signed the re-classification paperwork, adding the phrase "under duress" next to his signature. In the box on the paperwork labeled "Justification, Program Recommendations, and Summary," the **only** comments listed were "Life sentence, RNA-Low" (-risk to inmates, staff and public) and Plaintiff's job assignment "CLGOC" ...there was no other writing in this box.

Finally, Plaintiff submitted a copy of the 2-page statement and highlighted case law to be entered into the record of the proceedings and attached to the re-class paperwork along with a completed appeal form he brought with him to the hearing for AWT Cobble to review and be informed of, as his signature was the 4th signature Plaintiff's re-classification paperwork required for approval.

53.     On May 13, 2022, Plaintiff received the re-classification appeal back from WARDEN Phillips, showing that he upheld the classification action, and again ignored the act of retaliation or the danger it placed Plaintiff in.

54.     On May 19, 2022, Plaintiff, having felt he'd received no appreciable or tangible response to the letters he'd mailed on May 9, 2022, Plaintiff mailed out a new letter to the same recipients as before, converted the substance first letter to a sworn statement and enclosed a copy of it to each of the previous parties.   Plaintiff also mailed copies of these letters to various media outlets and civil rights organizations throughout TENNESSEE and Washington, D.C..

55.     TDOC Policy #401.08 does not provide for routine prison transfers, for transferring inmates who have engaged in constitutionally protect conduct or for an inmate having been at a facility for any particular length of time.  Such reasons do not exist in said policy.

56.     Plaintiff remained at BCCX Site-2 for just shy of 7 years.  TOMIS records will confirm that there are dozens of inmates, whom Plaintiff personally knows, that have been housed at BCCX Site-2 for more than 10 years; there are at least a dozen who have been there for over 15 years; and a few who have been there for 25 years or more.  Plaintiff is identical in all meaningful respects to these other "long staying" inmates and the only difference between he and such inmates is his assertion of his Protected First Amendment rights of Access to the Court and Redress of Grievances.

The reason inmates can remain at an institution for indefinite lengths of time is because those inmates do not present any disciplinary or security threats, thus transferring them does not improve the security at a given location or serve a criminogenic need of such inmates.  Quite the opposite affect would be achieved by transferring inmates who are recognized as existing in harmony with TDOC's or CORECIVICS expectations of them and thriving within a given facility.

57.     ·TDOC does however have a history, well documented in the many state and federal courts of TENNESSEE of a pattern and practice of retaliation against inmates and subjecting inmates who complain about and expose crimes and unconstitutional conditions within TDOC relating to the conditions of their confinement to retaliatory transfers, which can be corroborated by cross-referencing such inmate's filings with their transfer dates in TOMIS.  See *Tankesly v. Aramark*, Case No.: 1:20-CV-00017 (M.D. Tenn. 2020) (citing a documented extensive history of retaliatory transfers); *Hempstead v. Tony Parker, et al.*, Case No.: 3:21-CV-417-TAC-DCP (E.D. Tenn. 2021); and *Vargas v Janow*, 2021 WL 508 4579 (M.D. Tenn. 2021), just to cite a recent few.

This pattern and practice of TDOC seems already known in this court, given that the only response to Plaintiff's initial filings in the case that triggered this retaliation as-well-as this case, was not to remit the copies, enclosed therein, of those filings marked with a "C" in the upper right corner, but to instead simply send Plaintiff a Notice of his duty to notify the Court of a change of address.

58.     Later on May 19, 2022, around 11:30 pm, BCCX security staff started rounding up and delivering Plaintiff and other inmates scheduled to depart the facility the next morning on transport to the clinic to undergo Covid-19 tests as required for transport between facilities. Calvin Tankesly and J. Hollingsworth were among those in the procession.

When Plaintiff was taken into the examination room to have the test administered, he calmly initiated a dialog with the nurse.  Plaintiff verified that the Covid-19 test was in fact a medical procedure and after a minute of conversing with her, was finally able to extract from her that he did have the right to refuse the administering of the Covid-19 test.  Plaintiff told her, that respectfully he refused to take the Covid-19 test.

After the escort officer Plaintiff was with, Officer Jaffer, called in the staff members in charge of the

yard that shift, Corporal Rheal, who then called in the Shift Commander, Lieutenant Green, and after each security staff tried to convince Plaintiff that he had to take the test, and after the nurse informed each of them that Plaintiff had the right to refuse to take the test Plaintiff was finally given an ultimatum. Take the test or go to the "hole" (the disciplinary/PC unit).

Plaintiff told them the choice for him was simple, he said, "go to a gang infested facility where there is a high likelihood that 'I' will be soon harmed and/or killed or go to an empty room...I'll go to the 'hole'."

59. After midnight on May 20, 2022, the same nurse who was in the clinic, Jessica Mussared, came to the "hole" and had Plaintiff sign a medical refusal form. She had already written on the form, "inmate refused to take the Covid-19 test for an outgoing chain transport" (or some approximation thereof). Plaintiff added the words, "I did not request this test. I'm afraid." Plaintiff then signed the form.

60. When Plaintiff is unable to access devices with which he can type his legal productions he is forced to hand-write everything, in quadruplication in some cases. While in the "hole," Plaintiff had no access to such a device. Such lengthy handwriting caused the arthritis in Plaintiff's right thumb to become inflamed and caused him to endure great pain and suffering so that he could access the court and pursue the lawsuit which triggered this retaliation.

61. Plaintiff's arthritis, inflamed by Defendants' segregation and separation from legal drafting equipment, also caused Plaintiff mental suffering and anguish from worrying (about his potential inability to meaningfully prosecute the lawsuit which triggered this retaliation and vindicate Plaintiff's rights) and the prejudice to Plaintiff's case the persisting retaliatory acts continued to cause Plaintiff.

62. On May 20, 2022, at approximately 8:50 – 8:55 am, Corporal Bolden from the Office of Investigation and Conduct (OIC) (also known as Internal Affairs), located at BCCX, came to see Plaintiff while he was in the "hole". Plaintiff made (2) Tip-Line calls to Cpl. Bolden's office from an inmate phone on or around May 13, 2022 and May 17, 2022, and the Cpl. Said he had come to follow up on those calls. Cpl. Bolden recorded the conversation with Plaintiff's consent. Plaintiff explained the broad strokes of the escalating retaliatory actions to show the pattern and practice of continuing retaliation. Plaintiff told him of the false Contact Note Allan Lewis had placed on Plaintiff in TOMIS and provided him with the digital time stamp of the Contact Note as-well-as the precise contents of the note. Plaintiff also explained to him that this retaliatory transfer would result in additional defendants being brought under suit, that he did everything in his power to inform every authority he's aware of of the severity of the circumstances in his situation, including the re-classification panel members, to give them every opportunity to digress from and stop these retaliatory acts. Plaintiff further explained that in addition to the (4) members of the re-classification panel likely coming under suit, that difficulties accessing the court or ignoring his protection issues at the receiving institution could necessitate his involving in litigation additional members of staff at the receiving institution, thus creating friction there and possibly additional institutional transfers creating an ongoing cycle of retaliation that will unnecessarily prolong litigation and frustrate the prosecution of Plaintiff's lawsuit that triggered this retaliation as-well-as the Court in addition to the prejudice to Plaintiff, and his case, all of this would obviously entail.

Finally, Plaintiff made it clear that he wanted to be protected from this retaliatory transfer to an environment with foreseeable negative consequences.

63. On May 25, 2022, at approximately 10:50 am, COUNSELOR D. Padgett came to see Plaintiff in quarantine and asked him if he still wanted to be protected from the retaliatory institutional transfer. Plaintiff told him "yes." COUNSELOR Padgett then tried to squeeze into a 1¾ box on a piece of paper the language necessary for someone else to understand the nature of Plaintiff's circumstances. After Plaintiff worked with COUNSELOR Padgett for roughly 5 minutes, COUNSELOR Padgett said that he thought he had it, using language of his own choosing to replace Plaintiff's wording. When Plaintiff asked him if the form he was filling out was a CR-3241 (A Protective Services Investigation

Routing Sheet), he replied "yes." He also said he would submit it immediately to OIC BCCX. Plaintiff thanked him for filling out that form for Plaintiff's safety. (For the record, OIC is not listed in TDOC Policy #404.09(VI)(A)(2), as an available authority for remittance of said form.)

64. Later on May 25, 2022, at approximately 12:10 – 12:15 pm, Cpl. Bolden came to see Plaintiff about the CR-3241 COUNSELOR Padgett submitted to his office. (He thus identified himself as the investigating officer, pursuant to TDOC Policy #404.09) Plaintiff took note of this oddity because TDOC Policy #404.09 (IV)(A)(2) states: "[t]his information (referring to the CR-3241) shall be immediately transmitted to the shift supervisor/ASSOCIATE WARDEN OF SECURITY/Deputy Superintendent...who shall review the information to determine if the inmate requires immediate protection as-well-as request a formal inquiry by staff designated by the WARDEN/Superintendent." It didn't make sense to Plaintiff that the WARDEN Phillips could designate staff from what is supposed to be an autonomous department (OIC) lying outside of his chain of command (so that their office can perform review and investigations unfettered and without interference from the staff being reviewed and investigated, including the WARDEN himself). Cpl. Bolden said that he had come to develop and complete the CR-3240 (Protective Services Investigation Inquiry/Review Form) which is to be completed by the investigating staff member and made available to the Protective Services Panel within seven days per TDOC Policy #404.09(VI)(B)(1). Since he and Plaintiff had already covered the circumstances of Plaintiff's high profile status and protections issues, Plaintiff mostly provided him with additional documentation for his investigation into this and the previous (2) instances of retaliation Those documents were: both Sworn Affidavits Plaintiff produced regarding the (3) acts of major retaliation; a 2-page list of the recipients who received the letters on May 9, 2022 and May 19, 2022; and photographs, which he took on his phone, of the 2-page signed statement I gave each member of the re-classification panel of May 10, 2022 and the appeal of that classification, finalized, showing acknowledgment and disregard for my protection circumstances and the retaliatory nature of the transfer via denial of said appeal for unrelated procedural reasons. Cpl. Bolden told Plaintiff that he was going to recommend that Plaintiff be transferred back to general population at BCCX Site-2.

65. Still later on May 25, 2022, somewhere between 1:00 – 1:45 pm, Plaintiff was moved from the front of the "hole," to back behind the gate that separated the unit's disciplinary from the protective custody inmates, instead of returning him to the general population at BCCX Site-2. Effectively recommending that Plaintiff be kept separated from the general population at BCCX Site-2, where Plaintiff said he didn't have any protection issues.

66. On May 30, 2022, Plaintiff submitted a request for library services, including a visit with the legal aid to relay search instructions for materials which he needed to file a preliminary injunction, that were only available on the WestLaw computer in the library.

67. On May 31, 2022, expecting the services from the legal request Plaintiff made the day before, he asked about those services throughout the morning. After asking repeatedly about the services, Corrections Officer L. Houston finally told Plaintiff, around 2:10 pm, that the library was told they will now be required to schedule appointments with the Team-1 Unit Manager, Randall Lewis, for the legal aid to be able to provide services to the "hole."

68. On June 1, 2022, at approximately 1:10 pm, Unit Manager Randall Lewis, SERGEANT Luke Burns and COUNSELOR D. Padgett came to Plaintiff's cell to talk to him about his protection issues. (These 3 people comprised the Protective Services Panel mentioned in #65.) Plaintiff told them the circumstances of his protection issues, which they already knew from the report Cpl. Bolden submitted to them. Plaintiff told them that he could be safely transferred back to general population at BCCX Site-2. Randall Lewis did the speaking for the panel. Randall Lewis told Plaintiff that the panel was going to recommend that he be transferred back to general population there at BCCX Site-2. COUNSELOR D. Padgett wrote words to that effect on a "release contract" they frequently use with inmates in protective custody (according to the testimony of other inmates who have also signed those contracts in the past) and the (4) of them (Plaintiff, Lewis, Burns and Padgett) signed that paper together.

Unit Manager Randall Lewis then said, "it's going to be up to the WARDEN to approve the recommendation." Afterwards, Plaintiff asked COUNSELOR D. Padgett, "if the WARDEN declined the recommendation would you receive word of that," and "if such an outcome did occur would we (the Protective Services Panel and Plaintiff) then be required to come to an agreement on other arrangements?" COUNSELOR D. Padgett answered "yes" to both questions. The recommendation that Cpl. Bolden, Unit Manager Randall Lewis, SERGEANT Luke Burns and COUNSELOR D. Padgett told Plaintiff they were making is outlined in TDOC Policy #404.09(VI)(C)(3)(d) "[r]ecommend administrative or regular transfer to the general population of **another** facility[,]" because ever since May 10, 2022, Plaintiff has been shown in TOMIS to be classified to HCCF.

69. On June 3, 2022, Plaintiff filed with the Court and Defendants in the lawsuit that triggered the retaliation herein, a Motion for Temporary Restraining Order [without Notice] and Preliminary Restraining Order with the requisite Certificate of Attempts to Notify Defendants and Counsel of Record, Memorandum of Law, Verified Complaint and 18 supporting Affidavits and Attachments seeking immediate remedy to Defendants' retaliatory acts contained herein, which were imbalancing the status quo in Defendants favor and causing prejudice and harm to Plaintiff and his constitutionally protected prosecution of this lawsuit, and asked for a hearing on the issues. As of the day of this filing, that hearing was never docketed to be heard.

70. On June 8, 2022, Plaintiff was released from the "hole" into general population at BCCX Site-2, however there was no change in his institutional classification. Based on the available evidence, all the parties mentioned in #69 above, lied about the direction in which Plaintiff's institutional placement was heading.

71. On June 13, 2022, Plaintiff asked COUNSELOR Tim Mooneyham why there had not been a re-classification pursuant to Plaintiff's signed contract and release from protective custody and Tim Mooneyham replied, "Why would there be? If I re-classified you, I'd simply classify you to HCCF again." This statement along with the fact that Plaintiff was not re-classed back to general population at BCCX Site-2, make it clear that TDOC staff refuse to acknowledge his protection issues, have conspired, and intend to continue a conspiracy that displays deliberate indifference to Plaintiff's physical safety and have transferred him to an environment with foreseeable negative consequences to his well-being and are desirous of him suffering irreparable harm and punishment beyond that imposed by law, as retaliation for his assertion of protected First Amendment rights in Accessing the Courts and the Redressing of Grievances in the lawsuit that triggered the retaliation herein.

72. Also on June 13, 2022, a ruling came down from the U.S.D.C. EASTERN DISTRICT of TENNESSEE in *Adams v. Lewis*, 2022 WL 2110416, Case No.: 1:22-CV-125 (E.D. Tenn. 2022), which also involves retaliatory acts by Defendants in this case and subsequent surreptitious wrongful termination from the BCCX TRICOR PIECP. Circumstances so remarkably similar to those of Plaintiff's contained herein that they're worthy of noting.

Plaintiff certainly knows Inmate Chris Adams, but has not spoken to him in about a year, well before his transfer and subsequent firing from TRICOR, and Plaintiff has not communicated with Mr. Adams in any way since well before his transfer from BCCX. Plaintiff is only aware of the protected conduct of Chris Adams in grieving and complaining about conditions of his confinement, the 2-year expiration of the injunctive relief from his previous lawsuit, the temporal proximity of Chris Adams' transfer to the protected conduct and said injunctive expiration and the obvious causal connection between those events.

That being said, the similarities between the circumstances, actors, facts, and allegations in Mr. Adams' and Plaintiff's cases are striking. All 5 of the named Defendants in Chris Adams' complaint shared an integral part in Plaintiff's circumstances and the facts surrounding the relationship between those Defendants were only loosely known to Plaintiff, but highly relevant to this case.

73. On June 8, 2022, when Plaintiff went to the legal library the evening after being released from the "hole," he saw and spoke with Legal Aid Gregory Lance, who Plaintiff requested to see on

May 30, 2022, and the library officer, CCO Anthony (Tony) Tuttle. Mr. Lance said he was ready and willing to go to visit me in the "hole," which Mr. Tuttle confirmed and added that...when he called the shift commander to send the legal aid to the "hole," the Shift Commander told him there was a "new procedure" for inmates in the "hole," to obtain contact with library legal aids. Such visits now had to be scheduled with the Unit Manager Randall Lewis. Mr. Tuttle then called Randall Lewis after receiving this information to schedule an appointment for Legal Aid Lance to render legal services to Plaintiff in the "hole." As of the day Plaintiff was released over a week later, Unit Manager Randall Lewis had still not provided a time for the legal aid to visit Plaintiff in the "hole," effectively denying Plaintiff access to the research materials needed to properly assert his injunctive relief and thus the court itself.

74.     On June 9, 2022, Plaintiff ran into a ranking BCCX staff member whom he'd known (as an inmate) for many years. For protection purposes, this staff members name will be kept off the record until such time as his identity can be shielded by the court (Mr. X for now). This staff member told Plaintiff that aside from the likelihood of Plaintiff being hurt at HCCF, that he was being sent there because it was the furthest CORECIVIC location from KNOXVILLE that he could be sent to, so that if Plaintiff did somehow find some way to continue pursuing this case, he would spend days traveling back and forth to any Court appearances. Additionally, such a great distance would cause Plaintiff to spend many days and nights in custody in transit housing local to KNOXVILLE, instead of the day-trip (with no overnight stays such appearances would involve if he was housed at BCCX Site-2.) Also, there would be an increased likelihood that the legal materials Plaintiff would have to bring with him on such trips would be lost or damaged which would result in great set-backs, frustration to the Plaintiff's pursuit of justice, and prejudice to Plaintiff in the lawsuit that triggered the retaliation herein. Finally, Mr. X told Plaintiff that while there is typically no physical evidence of the retaliatory transfers that subjects of such retaliation ever learn of, the fact that there is a digital footprint of a retaliatory directive in Plaintiff's case on the STS servers is what sets Plaintiff's case apart, and that several other staff members have expressed their concern over this case.

75.     Long distance and frequent transfers of inmates who have grieved and/or accessed the courts complaining about the conditions of their confinement are a well documented common tactic utilized by prison systems to inhibit and shut down such complaints, developing such terms as "diesel therapy" and being on "the chain list." It's harder for an inmate to assert his legal rights with the "accidental" loss of legal property, disruptions to environmental acclimation (making difficult the inmate's ability to get their bearings) and sleep deprivation in transit housing which impacts the inmate's clarity of thought, ability to focus and subsequent litigatory performance.

76.     The violence and thus failure to protect or provide protection at CORECIVIC institutions, tough ineffectually plead they may be, is quite evident from a cursory search of the civil complaints filed **over the past 5 years alone**, in TENNESSEE alone: *Atha v. Washburn*, 2019 WL 5549247; *Barnes v. Garner*, 2019 WL 2763844; *Duke v. McVey*, 2019 WL 1030541; *Seabrooks v. Core Civic*, 2019 WL 1015093; *Oatsvall v. CORECIVIC*, 2019 WL 5482929; *Thomas v. CORECIVIC*, 2019 WL 5555542; *Plemons v. CORECIVIC Administrative Head Quarters*, 2019 WL 4748319; *Atha v. Washburn*, 2020 WL 6743300; *Hickey v. Trousdale Turner Correctional Complex*, 2021 WL 3930734; *Delk v. HARDEMAN COUNTY CORRECTIONAL FACILITY*, 2022 WL 891229; *Thomas v. CORECIVIC, Inc.*, 2019 WL 6117350; *Hughes v. TDOC*, 2019 WL 601811; *Wilbur v. Trousdale*, 2021 WL 1405480; *Hughes v. TDOC*, 2020 WL 470306; *Plemons v. Washburn*, 2019 WL 7708942; *Hughes v. CORECIVIC*, 2021 WL 3046894; *Hughes v. CORECIVIC*, 2021 WL 2411342; *Perkins v. Washburn*, 2022 WL 706958; *Littlejohn v. CORECIVIC*, 2022 WL 1124855; *Johns v. Bouldin*, 2022 WL 969035; *Talley v. McKinney*, 2022 WL 616728; *Talley v. McKinney*, 2021 WL 125681; *Killan v. Ford*, 2019 WL 2358427; *Hopkins v. Ford*, 2019 WL 2358429; *Ralston v. Ford*, 2019 WL 2358428; *Perkins v. Washburn*, 2020 WL 3972749; *Warfield v. Washburn*, 2020 WL 70881; *Plemons v. CORECIVIC*, 2019 WL 2409677; *Eads v. TENNESSEE*, 2018 WL 4283030; *Turner v. Parker*, 2018 WL 2303282; *Atkins v. CORECIVIC, Inc.*, 2021 WL 4773080; *Damron v. Hardeman*, 2021 WL 278301; and *Lucas v. Chalk*, 2020 WL 6322797,

many of these are violations of the type which HCCF is currently under investigation for by the **TENNESSEE Bureau of Investigation (TBI)** and reported on by many of the media outlets in TENNESSEE. While housed at HCCF, Plaintiff has heard ranking staff members threaten inmates with physical harm to be implemented by the "goon squad," a reference to other inmates whom that staff member could direct to perform assaults. Staff regularly violate housing assignment restrictions allowing inmates to roam freely around the institution, and the institution regularly allows and even directs hundreds of inmates to engage in un-escorted movement throughout the premises each night during the nightly institutional lock-down.

77. TDOC, through their Level-III grievance responses since Plaintiff has been housed at HCCF and failures to intervene, consistently subordinates unconstitutional policies and conditions of confinement implemented by CORECIVIC.

78. When Plaintiff questioned Randall Lewis on July 10, 2022, about the failure of the panel to re-classify him or adhere to the terms of the contract they all signed, he told Plaintiff that the re-classification had been put "on hold," and that Plaintiff was "not going anywhere for the time being." A statement which obviously proved to be a lie, as Plaintiff was transferred to HCCF on June 17, 2022.

79. As a result of the retaliatory transfer, Plaintiff lost another high paying job, (12) "Program" Sentence Reduction Credits, both of his craft lockers in the BCCX Hobby Shop, the contents of both of those lockers (valued at around $1,500.00), the daily free access to the whole of the institutional compound that BCCX Site-2 inmates enjoy (including outdoor recreation (3) times a day) and the only friends Plaintiff has in his life since the day of his incarceration.

80. All of the acts committed by the actors in #226, #227 and #243 above, were part of a concerted effort by Defendants to avoid compulsory language in TDOC Policy regarding Plaintiff's classification status, deny Plaintiff due process and disregard his safety with deliberate indifference.

81. Defendants feel that Plaintiff's criminogenic needs are being met by removing him from the safest TDOC institution (BCCX Site-2) where he existed in harmony and compliance with TDOC's expectations, had no disciplinary issues and was a functionally integral member of the populace with a high paying job, surrounded by the only friends in his life, then placing him at one of the most violent institutions (HCCF) overwhelmed with gangs (who have affiliations with staff) who repeatedly attack non-affiliated inmates (primarily Caucasian), where Plaintiff is a high-profile target for violence from such gangs so he can live in constant fear for his safety.

## CLAIMS

### Claim One

82. The the STATE, TDOC, TRICOR, Tony Parker, Lisa Helton, Shawn Phillips, Brett Cobble and Allan Lewis, as-well-as all those who reviewed and/or approved the infringing acts having the authority to intervene, with deliberate indifference, through a failure to supervise delegated individuals under their authority and/or a failure to act on information timely brought to their attention, and/or acting either independently and/or collectively in conjunction with each other and/or agents, and/or employees and/or subordinates under their authority, with intent to violate the Constitutions of the United States and STATE OF TENNESSEE, fired Plaintiff from his TRICOR PIECP job as retaliation for Plaintiff utilizing his constitutionally protected Freedom of Speech in seeking Redress of Grievances and Accessing the Court and in so doing denied Plaintiff due process and the equal protection of the laws and violated Plaintiff's rights, which they knew, or should have known of, under Amendments 1, 5 and 14, Section 1 of the Constitution of the United States, Article 1, Sections 8 and 23 of the Constitution of the STATE OF TENNESSEE, 29 U.S.C. §§ 215(a)(3) and 218c(a)(2)-(5), 15 U.S.C. § 2087(a)(1)-(4), 26 U.S.C. § 7623(d), 42 U.S.C. §§ 1997d and 1997e, T.C.A §§ 39-16-402(a)(1)-(4), (b) and (e)(1), and 41-1-103(a) and (c), and TDOC Policies #501.01(IV)(L), (V) and (VI)(G), and #501.02(V).

The same Defendants, named within, fired Plaintiff in an attempt to intimidate him, deter him from asserting his constitutional rights, and manipulate and moot his legal standing within the "Takings" Claims, in violation of Article 3, Section 1 and Amendments 1, 5 and 14, Section 1 of the Constitution of the United States and Article 1, Sections 8 and 23 of the Constitution of the STATE OF TENNESSEE.

The same Defendants, named within, as-well-as all those who reviewed and/or approved the infringing acts having the authority to intervene, with deliberate indifference, through a failure to supervise delegated individuals under their authority and/or a failure to act on information timely brought to their attention, and/or acting either independently and/or collectively in conjunction with each other and/or agents and/or employees and/or subordinates under their authority, with intent to violate the Constitutions of the United States and STATE OF TENNESSEE, caused Plaintiff losses in the form of gainful high-paying employment wages and interest thereupon, needed for the prosecution of the lawsuit that triggered the retaliation herein, federally funded rehabilitative programming, TRICOR seniority, and various institutional, employment and organizational incentives.

The same Defendants, named herein, as-well-as all those who reviewed and/or approved the infringing acts having the authority to intervene, with deliberate indifference, through a failure to supervise delegated individuals under their authority and/or a failure to act on information timely brought to their attention, and/or acting either independently and/or collectively in conjunction with each other and/or agents and/or employees and/or subordinates under their authority, with intent to violate the Constitutions of the United States and STATE OF TENNESSEE, as a result of their retaliatory acts, have denied Plaintiff access to the court by preventing Plaintiff's timely filing of Discovery related motions pursuant to the deadline established by this Court in its April 14, 2022 Scheduling Order in the lawsuit that triggered the retaliation herein, in violation, which they knew, or should have known, was a violation of Amendment 1 of the Constitution of the United States.

**Claim Two**

83.  TDOC, TRICOR, Tony Parker, Lisa Helton, Shawn Phillips, and Allan Lewis, as-well-as all those who reviewed and/or approved the infringing acts having the authority to intervene, and with deliberate indifference, through a failure to supervise delegated individuals under their authority and/or a failure to act on information timely brought to their attention, and/or acting either independently and/or collectively in conjunction with each other and/or agents and/or employees and/or subordinates under their authority, with intent to violate the Constitutions of the United States and STATE OF TENNESSEE, placed a false Contact Note in Plaintiff's official TOMIS record as retaliation for Plaintiff utilizing his Protect Freedom of Speech in seeking Redress of Grievances, and thus created false government records in an effort to permanently bar Plaintiff's return to TRICOR and circumvent avenues of redress to Plaintiff's grievances that might yield a favorable outcome for Plaintiff, and in so doing violated Plaintiff's rights, which they knew, or should have known, under Amendments 1, 5 and 14, Section 1 of the Constitution of the United States, Article 1, Sections 8 and 23 of the STATE OF TENNESSEE, 29 U.S.C. §§ 215(a)(3) and 218c(a)(2)-(5), 15 U.S.C. § 2087(a)(1)-(4), 42 U.S.C. §§ 1997d and 1997e, T.C.A §§ 39-16-402(a)(1)-(4), (b) and (e)(1), 39-16-403(a)(1)-(2), and 41-1-103(a) and (c), and TDOC Policies #501.01(IV)(L), (V) and (VI)(G), and #501.02(V).

Furthermore, because Defendants utilized the knowingly false government records complained of herein to subsequently deny Plaintiff consideration for TRICOR PIECP employment for which he was both eligible and experienced, Defendants know, or should know, that they are in violation of the aforementioned Constitutions and statutes in addition to guidelines issued by the BUREAU OF JUSTICE ASSISTANCE with the OFFICE OF JUSTICE PROGRAMS, UNITED STATES DEPARTMENT OF JUSTICE, since TRICOR's PIECP participation exists pursuant to their status as a Certificate Holder under provisions set in 18 U.S.C. § 1761 and agreement with the UNITED STATES DEPARTMENT OF JUSTICE for PIECP eligibility.

## Claim Three

84.     The STATE, TDOC, TRICOR, Tony Parker, Lisa Helton, Shawn Phillips, Brett Cobble, Allan Lewis, Tim Mooneyham, Jessica Brown and Zack Koczwara, as-well-as all those who reviewed and/or approved the infringing acts having the authority to intervene, with deliberate indifference, through a failure to supervise delegated individuals under their authority and/or acting either independently and/or collectively in conjunction with each other and/or agents and/or employees and/or subordinates under their authority, with intent to violate the Constitutions of the United States and STATE OF TENNESSEE, implemented and carried out an institutional transfer of Plaintiff, an obvious member of a group of prisoners frequently singled out for violent attack by other inmates either as a result of his race or other factors, from the safest facility to one of the most violent and gang infested facilities, and displayed deliberate indifference towards his safety, as retaliation for Plaintiff utilizing his Protected Freedom of Speech in seeking Redress of Grievances and Accessing the Court in violation of Plaintiff's rights, which they knew, or should have known, under Amendments 1, 5, 8 and 14, Section 1 of the Constitution of the United States, Article 1, Sections 8 and 23 of the Constitution of the STATE OF TENNESSEE, 29 U.S.C. §§ 215(a)(3) and 218c(a)(2)-(5), 15 U.S.C. § 2087(a)(1)-(4), 42 U.S.C. §§ 1997d and 1997e, T.C.A §§ 39-16-402(a)(1)-(4), (b) and (e)(1), and 41-1-103(a) and (c), and TDOC Policies #401.08 et al. and (IV)(F), #404.09 et al., #501.01(IV)(L), (V) and (VI)(G), and #501.02(V).

The same, named within, as-well-as all those who reviewed and/or approved the infringing acts with the authority to intervene, with deliberate indifference, through a failure to supervise delegated individuals under their authority and/or acting either independently and/or collectively in conjunction with each other and/or agents and/or employees and/or subordinates under their authority, with intent to violate the Constitutions of the United States and STATE OF TENNESSEE, have caused Plaintiff losses in the form of gainful high-paying employment  and wages with interest thereupon, needed for the prosecution of the lawsuit that triggered the retaliation herein, both of his assigned craft lockers in the BCCX Hobby Shop containing property valued at approximately $1,500.00 which he was forced to send out at his own expense as donation to an outside entity, outdoor recreation (3) times a day and the only friends Plaintiff has in his life since the day of his incarceration.

## ADDITIONAL CLAIMS
### Claim Four (§ 1985)

85.     Defendants, along ·with those under their authority, have conspired, and engaged, and continue to engage, with deliberate indifference, and with intent to violate the Constitutions of the United States and STATE OF TENNESSEE, in a pattern and practice of retaliation, and conspiracy to retaliate against Plaintiff utilizing his constitutionally protected rights to freedom of speech, accessing the courts and redressing of grievances to complain about unconstitutional conditions of his confinement, which they knew, or should have known, was in violation of Article 3, Section 2 and Amendments 1, 5, 8 and 14, Section 1 of the Constitution of the United States, Article 1, Sections 8 and 23 of the Constitution of the STATE OF TENNESSEE and TDOC Policies #501.01 (IV)(L), (V) and (VI)(G) and #501.02(V).

These same individuals, named herein, have committed and continue to commit specific overt acts in the furtherance of their conspiracy to cause injuries to Plaintiff.

## Claim Five (§ 1986)

86.     All defendants, along with those under their authority, having failed to supervise them, and having knowledge that the foregoing acts were about to be committed, and having the power to prevent

or aid in the preventing the commission of the same, wrongfully neglected or refused to do so. Since the foregoing acts came to fruition, Defendants, for all damages caused by such wrongful act, which such persons by reasonable diligence could have prevented, are liable to Plaintiff for all damages resulting from the aforementioned violations to Plaintiff's rights.

## Claim Six

87.     Defendants, through the commission of the unconstitutional acts complained of herein, which were committed with intent to violate the Constitutions of the United States and STATE OF TENNESSEE, have caused Plaintiff physical suffering from inflammation of his arthritis in his right thumb which occurred when Defendants removed Plaintiff from general population and the legal tools necessary to implement his protected First Amendment rights of Freedom of Speech, Redress of Grievances and Access to the Court and mental suffering and anguish from Plaintiff worrying about the prejudice such retaliation causes to his successful litigatory outcomes and the failure of the lawsuit that triggered this retaliation as a result of having to additionally defend himself against such retaliatory acts.

## CLOSING

Plaintiff seeks all available avenues of statute in this prosecution and the raising of all valid claims supported by the factual allegations contained herein, despite the assertion of any incorrect legal theories.

Plaintiff also requests, pursuant to *Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir 2004); *Dellairo v. Garland*, 222 F. Supp 2d 86, 89 (D. Me. 2002); and *Preston v. New York*, 223 F. Supp. 2d 452, 461 (S.D.N.Y. 2002), *aff'd*, 87 Fed.Appx 221 (2d Cir. 2004)(unpublished), that this Court considers all documents filed in this case, in addition to this Complaint, in determining whether a Claim has been stated.

## REQUESTED RELIEF

Wherefore, Plaintiff, and those similarly situated, pray, for relief as follows:

I.      General damages against all Defendants, according to proof;

II.     Special damages against all Defendants, according to proof;

III.    Compensatory damages against all Defendants, according to proof;

IV.     Punitive damages against all Defendants, the maximum that is allowed by law;

V.      An Order directing the TRICOR and/or Allan Lewis to immediately reinstate Plaintiff, to the contracted position he was wrongfully removed from in retaliation, and that such position be commensurate with the seniority he would have if he were never terminated, and to make Plaintiff whole in every way, including payment of 300% of lost wages, interest accrued thereon, and restoration of said seniority;

VI.     An Order directing TDOC to restore and credit all Program Sentence Reduction Credit days lost as a result of the retaliatory transfer to HCCF and to expunge all TOMIS contact notes involved in, or relating to Plaintiff's TRICOR employment, the filing of this or any lawsuit or grievances, that are not neutral in meaning or intent since December 21, 2022;

VII.    An Order directing the TDOC to return Plaintiff to BCCX Site-2 for his TRICOR PIECP reinstatement, and to provide Plaintiff with a wood locker in the hobby shop in addition to a payment of remuneration for the craft property lost as a result of Plaintiff's retaliatory transfer;

VIII.   An Order directing the TDOC and TRICOR to re-extend any and all missed incentive meals and/or opportunities that Plaintiff was denied participation in, as a consequence of Defendants actions in this case, whether such incentives were institutional, or employment related;

IX.     An Order directing the the STATE, TDOC, CORECIVIC, each of them, their agents,

successors, deputies, servants and employees, and all persons acting by, through or under them or any of them or by or through their order, to:

A.    Cease any and all retaliatory actions, including but not limited to, any negatively consequential transfers or housing assignments, detentions or other custodial restrictions against Plaintiff;

B.    Not further retaliate against Plaintiff, single him out in any way, or take any adverse or negative action against him including but not limited to, any negatively consequential transfers or housing assignments, detentions or other custodial restrictions or terminations of employment;

C.    Not discriminate against Plaintiff, with respect to privileges and benefits associated with his general population institutional access, or take any other action which would impede his ability to carry out his day-to-day activities and responsibilities, based on his complaints presented in this case, the filing of this or any other action or grievance, or any other actions taken or yet to be taken by him pursuant to this litigation; and

D.    Not signal, urge, encourage, require, direct, mandate or order any other person or entity to take any action or engage in any reprisal or retaliation against Plaintiff, for raising the complaints presented in this case, asserting his constitutional rights, or pursuing this lawsuit.

X.    Prosecutor's fees as provided by law;

XI.   An award of interest, including pre-judgment interest, at the legal rate;

XII.  Statutory damages and/or penalties as provided by law;

XIII. All costs of suit incurred herein and litigation arisen out of the same transaction or occurrence and involving one or more of the same parties; and

XIV.  Such other and further relief as this Court may deem just and proper.

## JURY DEMAND ON ALL ISSUES

Pursuant to Rule 38(b) of the Fed. R. Civ. P., Plaintiff, demands trial by jury for all issues pleaded herein so triable.

## ACKNOWLEDGMENT

I, Christopher-Stephen: Jones, beneficiary, am the Plaintiff in the above-entitled action. I have created the foregoing complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

I, therefore swear, under penalty of perjury, that the foregoing is true and correct.

Dated: February 10, 2023

Respectfully submitted,
Without Prejudice,

Christopher-Stephen: Jones, beneficiary, Pro per
2520 Union Springs Road
WHITEVILLE, TN 38075

# UNITED STATES DISTRICT COURT
## FOR THE
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

Christopher-Stephen: Jones, beneficiary,

      Sovereign, Plaintiff,

    v.                                  Case No.: 3:23-CV-9-KAC-DCP

STATE OF TENNESSEE, TENNESSEE
DEPARTMENT OF CORRECTION (TDOC),
TENNESSEE REHABILITATIVE INITIATIVE
IN CORRECTIONS (TRICOR), Tony Parker,
Lisa Helton, Shawn Phillips, Brett Cobble,
Melissa Campbell, Allan Lewis, Brian Cox, Tim
Mooneyham, Jessica Brown and Zack Koczwara.

                Defendants.

### Notice to the Court Regarding the Court Ordered Amended Complaint

Plaintiff, Christopher-Stephen: Jones, beneficiary, Sovereign, pro per, Appearing Specially, not Generally or Voluntarily, in writing as beneficiary of the Cestui que Trust "CHRISTOPHER STEPHEN JONES," Trust No. 413295662 and Prison Trust "JONES CHRISTOPHER," Trust No. 00548278, would notify this Honorable Court of the following:

    1.    Plaintiff did his very best to comply with this Court's ORDER issued January 30, 2023;

    2.    Plaintiff endeavored in the 3 days available to him since receiving this Court's ORDER on February 7, 2023, to "set forth in concise language" the facts containing "the who, what, when,, where, why, and how" of the individual claims this Court allowed to be included (See Doc 6, PageID #: 146); and

    3.    Plaintiff begs this Honorable Court's pardon if his lack of understanding or available time prevented him from fully complying with the Court's directives.

                            Respectfully submitted,
                            Without Prejudice,

                            Christopher-Stephen: Jones, beneficiary, Pro per

1

2520 Union Springs Road
WHITEVILLE, TN  38075

2

Christopher Stephe...
I/M# 00548278
HCCF
2520 Union Springs Road
Whiteville, TN 38075



Hardeman County
Correctional Facility
Outgoing Legal Mail

United States District Court
Eastern District
800 Market Street
Suite 145
Knoxville, TN 37902

RECEIVED

FEB 21 ...

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

**Legal Mail**

**Legal Mail**

**Legal Mail**



Correctional Facility
Has Neither Inspected

Form 12-3

Not Censored And Is Not
Responsible For the Content